******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

EMMANUEL THIERSAINT *v*. COMMISSIONER OF
CORRECTION
(SC 19134)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Robinson, Js.

*Argued April 29, 2014—officially released April 14, 2015*

*Matthew A. Weiner*, deputy assistant state's attorney, with whom were *Marjorie Allen Dauster*, senior assistant state's attorney, and, on the brief, *David I. Cohen*, state's attorney, and *Marcia A. Pillsbury*, deputy assistant state's attorney, for the appellant (respondent).

*Kate Mollison* and *Celso Perez*, law student interns, with whom were *Muneer I. Ahmad*, *James Swaine*, and, on the brief, *Robert Fuentes*, law student intern, for the appellee (petitioner).

*Elisa L. Villa* filed a brief for the Connecticut Criminal Defense Lawyers Association as amicus curiae.

*Christopher N. Lasch* filed a brief on behalf of various legal scholars as amici curiae.

*Opinion*

ZARELLA, J. The respondent, the Commissioner of Correction, appeals from the judgment of the habeas court granting the amended petition for a writ of habeas corpus filed by the petitioner, Emmanuel Thiersaint, on the ground that the petitioner's trial counsel rendered ineffective assistance by failing to advise him, pursuant to the rule announced in *Padilla* v. *Kentucky*, 559 U.S. 356, 130 S. Ct. 1473, 176 L. Ed. 2d 284 (2010), that his conviction for possession of narcotics with intent to sell, an aggravated felony, would result in his almost certain deportation and permanent removal from the United States.[1] The respondent claims that the judgment should be reversed because the habeas court incorrectly concluded that *Padilla* applies retroactively to the petitioner's guilty plea, and, therefore, the petitioner was misadvised and prejudiced under *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). The petitioner replies that this court should conclude that *Padilla* applies retroactively as a matter of Connecticut law and affirm the habeas court's judgment because: (1) the requirement in *Padilla* that defense counsel provide accurate immigration advice to noncitizen clients was required by the professional norms in Connecticut at the time of his trial; (2) even if *Padilla* announced a new rule, Connecticut habeas petitions function as de facto direct review of ineffective assistance claims, and both old and new rules are applicable on direct review; (3) Connecticut has alternative procedural mechanisms to ensure the finality of criminal judgments; and (4) Connecticut historically has given special solicitude to the right to counsel and should continue to uphold that tradition in the present case. In the alternative, the petitioner argues that his trial counsel provided him with gross misadvice that rendered his plea involuntary, unintelligent, and thus invalid, and that his counsel failed to provide effective assistance because he did not pursue a drug dependency defense.[2] We conclude that *Padilla* does not apply retroactively to the petitioner's plea and that the petitioner cannot prevail on either of the alternative grounds. Accordingly, we reverse the judgment of the habeas court.

The following relevant facts and procedural history are set forth in the habeas court's opinion. "In 1994, when the petitioner was fourteen years old, he left his native country of Haiti with his father and came to the United States. He entered the United States legally, with a 'green card' and thus held a status as a permanent resident of the United States. He has lived in the United States for almost two decades, since 1994, and attended high school here. He has no relatives in Haiti.

"A few years after the petitioner arrived in the United States, he was in a serious car accident, during which he was critically injured. As a result of his injuries, the

petitioner had to have his right leg amputated above the knee and since that time has required either [a] prosthesis to walk or a wheelchair to get around. . . .

"After the petitioner's accident, he spent eight months in the hospital, where he was given a number of drugs for his injuries. After leaving the hospital, the petitioner developed a drug addiction to crack cocaine. The petitioner has not used illegal drugs for several years. He presently lives with his girlfriend of seven years and their young daughter. . . .

"On September 20, 2006, the petitioner was arrested and charged in two separate cases with the following charges in both cases: (1) sale of narcotics in violation of General Statutes [Rev. to 2005] § 21a-278 (b); (2) sale of narcotics within 1500 feet of a school in violation of General Statutes § 21a-278a (b); (3) possession of narcotics in violation of General Statutes § 21a-279 (a); and (4) possession of narcotics within 1500 feet of a school in violation of . . . § 21a-279 (d). The charges stemmed from two $20 sales of crack cocaine by the petitioner to an undercover police officer. At the time of his 2006 arrest, the petitioner was on probation, having been convicted [in 2004] after a plea of possession of a controlled substance in violation of . . . § 21a-279 (a). As [a] condition of his probation, the court ordered 'substance abuse evaluation and treatment.'

"The petitioner was arraigned on the new charges on September 29, 2006, at which time he pleaded not guilty. The petitioner could not make the bond set by the court and therefore, remained incarcerated during the pretrial proceedings in this case. Because he could not afford his own attorney, [S]pecial [P]ublic [D]efender [John] Imhoff was appointed to represent him.

"[Imhoff] is an experienced criminal defense attorney. In 2006 . . . Imhoff had a state contract to represent indigent criminal defendants for a fee. In the petitioner's case . . . Imhoff was paid $250, which covered his fee for all of the pretrial proceedings in this case. When . . . Imhoff was appointed to represent the petitioner, he knew the petitioner was from Haiti, and had entered the United States legally.

"Although the petitioner's record evinced a possible substance abuse history . . . Imhoff did not seek to have the petitioner evaluated for substance abuse. Also, even though [a diversionary program operated by the former Connecticut Alcohol and Drug Abuse Commission, now the Department of Mental Health and Addiction Services] under General Statutes § 17a-696, was available to the petitioner . . . Imhoff did not pursue it because he did not believe the court would grant [the petitioner admission into] the program.

"[Imhoff] engaged in plea negotiations with the state's attorney and the court and ultimately received a court

offer of seven . . . years [of imprisonment] suspended after two . . . years followed by five . . . years' probation with no mandatory minimums on all charges if [the petitioner pleaded] to one count of possession with intent to sell under General Statutes § 21a-277 (a). During the plea negotiations . . . Imhoff asked the state to reduce the charge to possession only, but the state declined because the petitioner had sold drugs to an undercover police officer. . . . Imhoff did not raise the issue of a reduction in the charge to possession with the court during the supervised pretrial. In seeking a reduction of the charge to possession, Imhoff did not explain to the state or the court that the petitioner was subject to mandatory deportation or suggest that the charge be reduced in exchange for the petitioner agreeing to do more prison time on the reduced charge.

"The petitioner testified that . . . Imhoff met with him approximately five times in the holding cells in the Norwalk courthouse, and did not advise him regarding the immigration consequences of his plea. . . . Imhoff testified that he told the petitioner that he should consult with an attorney knowledgeable in immigration law regarding the immigration consequences of the plea, as well as any postconviction immigration proceedings. Even though the petitioner was incarcerated and indigent . . . Imhoff did not obtain an immigration [attorney] for the petitioner to consult with nor did he himself consult with such an attorney on the petitioner's behalf." (Footnote omitted.)

"[Imhoff] had participated in seminars on representing noncitizen defendants, including one held in 2006 and sponsored by the [Chief] [P]ublic [D]efender's [O]ffice. He was provided with a manual . . . which provided guidance specific to representing noncitizen criminal defendants in Connecticut. [J. Baron & A. Walmsley, A Brief Guide to Representing Noncitizen Criminal Defendants in Connecticut (Rev. 2005).] The manual specifically and clearly indicates that § 21a-277 (a), possession with intent to sell, is an 'aggravated felony,' which it states is the 'worst category of criminal offenses for immigration purposes.' [Id., p. 4.]"

"Had . . . Imhoff consulted with an immigration attorney, he would have been advised to avoid any conviction that would constitute an 'aggravated felony' at all costs because a conviction under § 21a-277 (a) would constitute an aggravated felony that would subject the petitioner to mandatory detention and deportation, and bar him from asserting legitimate defenses to removal. . . .

"Despite believing that the petitioner needed separate counsel knowledgeable in immigration matters to advise the petitioner regarding the immigration consequences of the plea offer . . . Imhoff nonetheless claims to have advised the petitioner regarding these issues. Although . . . Imhoff could not recall precisely

what he told the petitioner . . . he could recall . . . [that he] told the petitioner that he would 'probably' have to deal with immigration after his state criminal proceedings concluded, that he would have an immigration hearing 'and if you have a hearing there is some chance you might win, but I thought it was very unlikely,' and 'it'd be very difficult not to be deported.'

"[Imhoff] did not tell the petitioner that because his plea to the charge of possession with intent to sell under § 21a-277 (a) would result in a conviction of an aggravated felony under federal law, that he would not return home because he would be mandatorily detained pending deportation after his sentence was completed, that he would have no legitimate defenses to deportation, that deportation was a virtual certainty, and that after being deported, he would be permanently barred from returning to the United States.

"On April 9, 2007, the petitioner pleaded guilty to possession with intent to sell in violation of . . . § 21a-277 (a) and received a sentence of seven . . . years [of imprisonment] suspended after two . . . years, followed by five . . . years of probation. The petitioner was canvassed by the court as to his decision to plead guilty. During the canvass, the court asked the petitioner, pursuant to General Statutes § 54-1j, if he understood 'that if you're not a citizen of the United States of America, then a conviction for the offense may have the consequence of deportation, exclusion from readmission to this country, or denial of naturalization pursuant to the laws of this country.' The petitioner responded that he understood. . . .

"Immediately upon being released from state prison on September 18, 2008, the petitioner was taken into custody by the United States Immigration and Customs Enforcement Agency . . . and the [federal government] commenced deportation/removal proceedings against him. The basis of the removal order was the state court conviction for possession of narcotics with intent to sell, and a 2004 conviction for possession of a controlled substance.

"On February 27, 2009, the petitioner's application for deferral of removal under the [United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, an international rights treaty adopted in 1984], the only defense available to the petitioner, was denied and the petitioner was ordered removed from the United States and returned to Haiti. The petitioner appealed [the] removal order to the Board of Immigration Appeals, which dismissed [the appeal] on May 27, 2009. Based on the changed country conditions in Haiti in the wake of the January, 2010 earthquake, the petitioner filed a motion to reopen his removal proceedings on August 2, 2011. That motion was denied on September 19, 2011.

"The petitioner filed petitions for review of both the removal order and the denial of the motion to open to the United States Court of Appeals for the Second Circuit, which consolidated both matters and denied them both on February 28, 2012. Thus, the petitioner has exhausted his federal challenges to the order of removal, and is subject to a final removal order. However, due to the physical conditions in Haiti stemming from natural disasters, deportations to that country have been temporarily deferred. The petitioner remains in the United States and has been released from federal custody, but is subject to a final order of removal and may be removed at any time." (Footnotes omitted.)

The petitioner filed a petition for a writ of habeas corpus on September 24, 2009, and an amended petition on November 7, 2011. The petitioner claimed ineffective assistance of counsel under *Padilla* on the ground that his attorney had failed to advise him that the state's plea offer and his plea of guilty and subsequent conviction would constitute an aggravated felony under federal law and subject him to virtually automatic deportation. The petitioner thus sought habeas relief "in the interests of justice" and under the federal and state constitutions.[3]

A three day trial was held on the habeas petition in April and May, 2012. In its memorandum of decision dated December 7, 2012, the habeas court initially concluded that the petitioner's federal sixth amendment ineffective assistance claim was governed by the two-pronged test set forth in *Strickland* v. *Washington*, supra, 466 U.S. 687, as modified by *Hill* v. *Lockhart*, 474 U.S. 52, 56, 106 S. Ct. 366, 88 L. Ed. 2d 203 (1985). See our discussion in part I of this opinion. The court then concluded that *Padilla* applied retroactively to the petitioner's guilty plea and that the petitioner had met his burden under the performance and prejudice prongs of the test enunciated in *Strickland*, as modified by *Hill*. The court finally concluded that the trial court's general plea canvass was insufficient to cure counsel's deficient performance. This appeal by the respondent followed.[4]

On appeal, the respondent claims that *Padilla* does not apply retroactively to the petitioner's guilty plea and that the judgment should be reversed because the United States Supreme Court determined in *Chaidez* v. *United States*, U.S. , 133 S. Ct. 1103, 1113, 185 L. Ed. 2d 149 (2013), that the rule announced in *Padilla* was a "new rule," and, therefore, the rule applies only to future criminal matters or to matters pending on direct appeal when *Padilla* was decided. The respondent also claims that the petitioner cannot prevail on his state law and other claims because he made no such claims in his habeas petition and, in any event, the rule in *Padilla* represents a departure from established Connecticut law. The petitioner replies that the rule in

*Padilla* may be applied retroactively as a matter of state law and, in the alternative, that his trial counsel gave him gross misadvice that rendered his plea unknowing, unintelligent, and involuntary. He also argues that his trial counsel was ineffective because he failed to pursue a drug dependency defense. We address each of these claims in turn.

I

We begin with the respondent's claim that *Padilla* does not apply retroactively to the petitioner's guilty plea under federal law. The standard of review and the law governing ineffective assistance of counsel claims is well established. "Although the underlying historical facts found by the habeas court may not be disturbed unless they were clearly erroneous, whether those facts constituted a violation of the petitioner's rights under the sixth amendment is a mixed determination of law and fact that requires the application of legal principles to the historical facts of this case. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard. . . .

"A criminal defendant is constitutionally entitled to adequate and effective assistance of counsel at all critical stages of criminal proceedings. *Strickland* v. *Washington*, [supra, 466 U.S. 686]. This right arises under the sixth and fourteenth amendments to the United States constitution and article first, § 8, of the Connecticut constitution. *Copas* v. *Commissioner of Correction*, 234 Conn. 139, 153, 662 A.2d 718 (1995). . . . It is axiomatic that the right to counsel is the right to the effective assistance of counsel." (Citations omitted; internal quotation marks omitted.) *Gonzalez* v. *Commissioner of Correction*, 308 Conn. 463, 469–70, 68 A.3d 624, cert. denied sub nom. *Dzurenda* v. *Gonzalez*, U.S. , 134 S. Ct. 639, 187 L. Ed. 2d 445 (2013).

A claim of ineffective assistance of counsel is governed by the two-pronged test set forth in *Strickland* v. *Washington*, supra, 466 U.S. 687. Under *Strickland*, the petitioner has the burden of demonstrating that "(1) counsel's representation fell below an objective standard of reasonableness, and (2) counsel's deficient performance prejudiced the defense because there was a reasonable probability that the outcome of the proceedings would have been different had it not been for the deficient performance." (Emphasis omitted.) *Johnson* v. *Commissioner of Correction*, 285 Conn. 556, 575, 941 A.2d 248 (2008). For claims of ineffective assistance of counsel arising out of the plea process, the United States Supreme Court has modified the second prong of the *Strickland* test to require that the petitioner produce evidence "that there is a reasonable probability that, but for counsel's errors, [the petitioner] would not have pleaded guilty and would have insisted on going to trial." *Hill* v. *Lockhart*, supra, 474 U.S. 59. An ineffective assistance of counsel claim "will succeed only if both

prongs [of *Strickland*] are satisfied." (Internal quotation marks omitted.) *Mozell* v. *Commissioner of Correction*, 291 Conn. 62, 77, 967 A.2d 41 (2009).

In *Padilla*, the United States Supreme Court considered whether advising a noncitizen criminal defendant of the possible deportation consequences of a guilty plea falls within the scope of representation required of criminal defense attorneys by the sixth amendment to the federal constitution and concluded that it did. *Padilla* v. *Kentucky*, supra, 559 U.S. 364–66. The court reasoned that "changes to our immigration law have dramatically raised the stakes of a noncitizen's criminal conviction. The importance of accurate legal advice for noncitizens accused of crimes has never been more important. These changes confirm our view that, as a matter of federal law, deportation is an integral part— indeed, sometimes the most important part—of the penalty that may be imposed on noncitizen defendants who plead guilty to specified crimes." (Footnote omitted.) Id., 364. The court continued: "We have long recognized that deportation is a particularly severe 'penalty' . . . but it is not, in a strict sense, a criminal sanction. Although removal proceedings are civil in nature . . . deportation is nevertheless intimately related to the criminal process. Our law has enmeshed criminal convictions and the penalty of deportation for nearly a century . . . . And, importantly, recent changes in our immigration law have made removal nearly an automatic result for a broad class of noncitizen offenders. Thus, we find it 'most difficult' to divorce the penalty from the conviction in the deportation context. . . . Moreover, we are quite confident that noncitizen defendants facing a risk of deportation for a particular offense find it even more difficult." (Citations omitted.) Id., 365–66. The court thus concluded that "advice regarding deportation is not categorically removed from the ambit of the [s]ixth [a]mendment right to counsel." Id., 366.

Having resolved this threshold question, the court in *Padilla* next concluded that "[t]he weight of prevailing professional norms supports the view that counsel must advise [his or] her client regarding the risk of deportation"; id., 367; and that whether counsel has provided such advice is properly considered under the first prong of *Strickland*. Id., 366–67. The court then determined that the defendant, Jose Padilla, had sufficiently alleged a constitutional violation under *Strickland* because the deportation consequences of his plea were "truly clear"; id., 369; and, therefore, his counsel's duty to give correct advice was "equally clear."[5] Id.

The United States Supreme Court did not consider whether the rule in *Padilla* applies retroactively to defendants whose convictions were final by the time that case was decided until approximately three years later in *Chaidez*. Relying on the principles set forth in

*Teague* v. *Lane*, 489 U.S. 288, 109 S. Ct. 1060, 103 L. Ed. 2d 334 (1989), the court in *Chaidez* agreed with the government that *Padilla* had "announced a 'new rule' and, under *Teague*, such rules do not apply in collateral challenges to already-final convictions." *Chaidez* v. *United States*, supra, 133 S. Ct. 1106. The court explained as follows: "*Teague* makes the retroactivity of our criminal procedure decisions turn on whether they are novel. When we announce a 'new rule,' a person whose conviction is already final may not benefit from the decision in a habeas or similar proceeding. Only when we apply a settled rule may a person avail herself of the decision on collateral review. . . .

"[A] case announces a new rule, *Teague* explained, when it breaks new ground or imposes a new obligation on the government. . . . To put it differently . . . a case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final. . . . And a holding is not so dictated, we later stated, unless it would have been apparent to all reasonable jurists. . . .

"But that account has a flipside. *Teague* also made clear that a case does *not* announce a new rule, [when] it [is] merely an application of the principle that governed a prior decision to a different set of facts. . . . [W]here the beginning point of our analysis is a rule of general application, a rule designed for the specific purpose of evaluating a myriad of factual contexts, it will be the infrequent case that yields a result so novel that it forges a new rule, one not dictated by precedent. . . . Otherwise said, when all we do is apply a general standard to the kind of factual circumstances it was meant to address, we will rarely state a new rule for *Teague* purposes." (Citations omitted; emphasis altered; footnote omitted; internal quotation marks omitted.) Id., 1107.

In further explaining why the rule in *Padilla* could not be given retroactive effect under the principles espoused in *Teague*, the court in *Chaidez* added: "*Padilla* would not have created a new rule had it only applied *Strickland*'s general standard to yet another factual situation—that is, had *Padilla* merely made clear that a lawyer who neglects to inform a client about the risk of deportation is professionally incompetent.

"But *Padilla* did something more. Before deciding if failing to provide such advice fell below an objective standard of reasonableness, *Padilla* considered a threshold question: Was advice about deportation categorically removed from the scope of the [s]ixth [a]mendment right to counsel because it involved only a collateral consequence of a conviction, rather than a component of the criminal sentence? . . . In other words, prior to asking *how* the *Strickland* test applied (Did this attorney act unreasonably?), *Padilla* asked *whether* the *Strickland* test applied (Should we even

evaluate if this attorney acted unreasonably?). And as we will describe, that preliminary question about *Strickland*'s ambit came to the *Padilla* [c]ourt unsettled—so that the [c]ourt's answer (Yes, *Strickland* governs here) required a new rule." (Citation omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) Id., 1108.

The court in *Chaidez* also observed that the scope of *Strickland* was unsettled when *Padilla* was decided because the court in *Hill* v. *Lockhart*, supra, 474 U.S. 52, more than twenty-five years earlier had "explicitly left open whether advice concerning a collateral consequence must satisfy [s]ixth [a]mendment requirements." *Chaidez* v. *United States*, supra, 133 S. Ct. 1108. As a result, the "non-decision" in *Hill* "left the state and lower federal courts to deal with the issue; and they almost unanimously concluded that the [s]ixth [a]mendment does not require attorneys to inform their clients of a conviction's collateral consequences, including deportation."[6] Id., 1109. The court in *Chaidez* further observed that, "when we decided *Padilla*, we answered a question about the [s]ixth [a]mendment's reach that we had left open, in a way that altered the law of most jurisdictions . . . ." Id., 1110. By "breaching the previously chink-free wall between direct and collateral consequences," the court in *Padilla* "broke new ground . . . ." (Internal quotation marks omitted.) Id. This was because, before *Padilla*, the court "had declined to decide whether the [s]ixth [a]mendment had any relevance to a lawyer's advice about matters not part of a criminal proceeding"; id.; and there existed no precedent that " '*dictated*' the answer"; (emphasis in original) id.; whereas *Padilla* rejected the categorical approach adopted by most state and federal courts and was the first to make the *Strickland* test operative in the context of immigration consequences. Id. The court in *Chaidez* thus concluded that "*Padilla* . . . announced a 'new rule.' " Id., 1111.

Mindful of this legal precedent, we turn to the respondent's claim that the ruling in *Padilla* does not apply retroactively to the petitioner's guilty plea under federal law. The habeas court's memorandum of decision was released on December 7, 2012, approximately two months before release of the decision in *Chaidez*. In fact, the habeas court acknowledged in a footnote that the retroactive application of *Padilla* was an "open question" that had been argued before the United States Supreme Court in *Chaidez* only one month earlier. Nevertheless, the habeas court rendered a decision and concluded, without the benefit of the soon to be released opinion in *Chaidez*, that the ruling in *Padilla* was intended by that court to be applied retroactively under federal law. As the preceding discussion indicates, however, the court in *Chaidez* determined soon thereafter that the ruling in *Padilla* was not to be given retroactive effect. Id., 1113. Accordingly, we agree with

the respondent that *Padilla* does not apply retroactively to the petitioner's guilty plea under federal law.

## II

The petitioner argues that, notwithstanding the decision in *Chaidez*, the judgment of the habeas court may be affirmed as a matter of state law. The petitioner contends that, under *Danforth* v. *Minnesota*, 552 U.S. 264, 282, 128 S. Ct. 1029, 169 L. Ed. 2d 859 (2008), this court is authorized by federal law to apply the rule in *Padilla* retroactively on state habeas review because the court in *Danforth* limited application of the principles articulated in *Teague* to collateral review of state decisions by federal courts. As a corollary to this argument, the petitioner contends that *Teague* does not apply to his state law claims because this court recognized in *Luurtsema* v. *Commissioner of Correction*, 299 Conn. 740, 753 n.14, 12 A.3d 817 (2011), that state courts are not bound by *Teague*.[7] Nevertheless, should this court apply the principles established in *Teague*, the petitioner articulates several grounds on which the court may find a constitutional violation under state law. We agree with the petitioner's interpretation of *Danforth* but do not agree that Connecticut courts should abandon *Teague*. We also disagree with the petitioner that, if *Teague* applies, there is a constitutional violation in the present case under Connecticut law.

## A

We begin by examining *Danforth*. In that case, the United States Supreme Court explained: "[T]he *Teague* rule of nonretroactivity was fashioned to achieve the goals of federal habeas while minimizing federal intrusion into state criminal proceedings. It was intended to limit the authority of federal courts to overturn state convictions—not to limit a state court's authority to grant relief for violations of new rules of constitutional law when reviewing its own . . . convictions." *Danforth* v. *Minnesota*, supra, 552 U.S. 280–81. The court further explained that, because "[f]ederalism and comity considerations are unique to *federal* habeas review of state convictions . . . comity militate[s] in favor of allowing state courts to grant habeas relief to a broader class of individuals than is required by *Teague*." (Citation omitted; emphasis in original.) Id., 279–80. The petitioner is thus correct in claiming that, under *Danforth*, state courts may give broader effect to new constitutional rules of criminal procedure than *Teague* allows in federal habeas review.

## B

The petitioner next argues that *Teague* should not apply in the present case because our decision in *Luurtsema* suggested that this court was not bound by *Teague*. In *Luurtsema*, we stated in a footnote that "the rules governing the retroactive application of new procedural decisions . . . derive from *Teague* v. *Lane*,

[supra, 489 U.S. 288]"; *Luurtsema* v. *Commissioner of Correction*, supra, 299 Conn. 753 n.14; but that *Teague* specified that "new rules of criminal procedure do not apply retroactively to already final judgments in federal habeas proceedings unless they fall under one of several specified exceptions."[8] Id. We also stated in *Luurtsema* that, "[a]lthough this court has in the past applied the *Teague* framework to state habeas proceedings as well . . . the United States Supreme Court recently held in *Danforth* v. *Minnesota*, [supra, 552 U.S. 282], that the restrictions *Teague* imposes on the fully retroactive application of new procedural rules are not binding on the states." (Citation omitted.) *Luurtsema* v. *Commissioner of Correction*, supra, 753 n.14.[9]

Contrary to the petitioner's suggestion, our reference in *Luurtsema* to *Danforth* did not mean that this court was not bound by *Teague*, but, rather, was intended to describe the reasoning in *Danforth*. Furthermore, even the petitioner has recognized that, on the few occasions when Connecticut courts have considered *Teague*, they have applied its principles without hesitation. See *State* v. *Payne*, 303 Conn. 538, 550 n.10, 34 A.3d 370 (2012) (*Teague* retroactivity holding inapposite because new rule of law is procedural); *Duperry* v. *Solnit*, 261 Conn. 309, 322, 803 A.2d 287 (2002) (habeas court improperly declared and applied new constitutional rule in collateral proceeding in contravention of principle enunciated in *Teague*); *Johnson* v. *Warden*, 218 Conn. 791, 796–98, 591 A.2d 407 (1991) (habeas court improperly applied *Teague* retroactivity holding to new nonconstitutional rule of criminal procedure); *Garcia* v. *Commissioner of Correction*, 147 Conn. App. 669, 677, 84 A.3d 1 (2014) (new procedural rule not retroactive under *Teague*).[10] Thirty-three other states and the District of Columbia likewise apply *Teague* in deciding state law claims.[11] We nonetheless review the petitioner's claim that *Teague* should be abandoned in Connecticut because this court has not previously been asked to reexamine *Teague* in light of the Supreme Court's recognition in *Danforth* that states are not bound by federal law when determining whether a new rule applies retroactively in a state collateral proceeding.

Despite the prevailing view among other jurisdictions, the petitioner argues that *Teague* should be abandoned in Connecticut because the pool of applicants who could seek relief under the retroactive application of *Padilla* is extremely limited and the state's interest in fairness and due process protections weighs more heavily than uniformity with the federal standard. We disagree.

We note that, during the eight months following the release of the decision in *Chaidez*, the Appellate Court rejected three *Padilla* claims on the basis of *Chaidez* and the Superior Court rejected one. See *Alcena* v. *Commissioner of Correction*, 146 Conn. App. 370, 374,

76 A.3d 742 (per curiam), cert. denied, 310 Conn. 948, 80 A.3d 905 (2013); *Saksena* v. *Commissioner of Correction*, 145 Conn. App. 152, 158–59, 76 A.3d 192, cert. denied, 310 Conn. 940, 79 A.3d 892 (2013); *Gonzalez* v. *Commissioner of Correction*, 145 Conn. App. 28, 33, 74 A.3d 509, cert. denied, 310 Conn. 929, 78 A.3d 145 (2013) (per curiam); *Gjini* v. *Warden*, Superior Court, judicial district of Tolland, Docket No. CV-10-4003834-S (March 6, 2013). Thus, the petitioner's claim that the retroactive application of *Padilla* in Connecticut would affect an extremely limited pool of applicants is not necessarily true.[12]

We also observe that the state's interest in fairness and due process protections must be balanced against the importance of the finality of convictions. We agree with the court's observation in *Teague* that "[a]pplication of constitutional rules not in existence at the time a conviction became final seriously undermines the principle of finality which is essential to the operation of our criminal justice system. Without finality, the criminal law is deprived of much of its deterrent effect." *Teague* v. *Lane*, supra, 489 U.S. 309. We also agree with the court in *Teague* that "[t]he costs imposed upon the [states] by retroactive application of new rules of constitutional law on habeas corpus . . . generally far outweigh the benefits . . . . In many ways the application of new rules to cases on collateral review may be more intrusive than the enjoining of criminal prosecutions . . . for it *continually* forces the [s]tates to marshal resources in order to keep in prison defendants whose trials and appeals conformed to the then-existing constitutional standards." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 310. In other words, states will be required to maintain records and expend additional administrative and financial resources on defendants for possibly many years following their convictions in order to defend against future habeas proceedings, which, if successful, may result in the need for another trial. In addition, *Teague* provides a framework that is relatively easy for courts to apply and achieve consistent results. We are therefore not inclined to depart from *Teague*.

The petitioner maintains that *Teague* finality concerns are inapplicable because Connecticut has mechanisms such as the doctrine of res judicata to ensure the finality of state criminal judgments and to avoid habeas review of claims previously raised on direct review or in other postconviction proceedings. We disagree. Although the first opportunity to raise a claim of ineffective assistance relating to a guilty plea is in the trial court through a motion to withdraw the plea; see Practice Book § 39-27 (4); there is no requirement that petitioners must use that opportunity to raise such a claim. Moreover, we have stated that the doctrine of res judicata is limited "to claims that actually have been raised and litigated in an earlier proceeding." (Internal quota-

tion marks omitted.) *Johnson* v. *Commissioner of Correction*, 288 Conn. 53, 67, 951 A.2d 520 (2008). Thus, if a petitioner has not filed a motion to withdraw a plea or has not raised and fully litigated an ineffective assistance of counsel claim in an earlier proceeding, he or she is free to raise the claim in a habeas proceeding, as petitioners often do. We therefore adopt the framework established in *Teague*, with the caveat that, while federal decisions applying *Teague* may be instructive, this court will not be bound by those decisions in any particular case, but will conduct an independent analysis and application of *Teague*.

C

The petitioner next contends that, even if this court applies *Teague* in deciding state habeas petitions, the habeas court's judgment in the present case should be affirmed because the rule in *Padilla* that trial counsel must provide accurate immigration advice to noncitizen clients was required by prevailing professional norms in Connecticut at the time of the petitioner's trial and by the relevant governing statutes, and, therefore, it was not a new rule under *Teague*.[13] As evidence of prevailing professional norms, the petitioner relies on the testimony of two expert witnesses, deemed credible by the habeas court, that his trial counsel had a duty to inform him of the virtual certainty of his deportation and the impossibility of his return to the United States should he plead guilty to an aggravated felony under federal law. He also relies on the requirement in § 54-1j[14] that the trial court and defense counsel must inform a noncitizen criminal defendant of the possible deportation consequences of a guilty plea. We disagree.

Although professional norms are intended to guide the conduct of attorneys, the violation of a professional norm does not necessarily render counsel's representation constitutionally deficient. The court noted in *Padilla* that professional norms "are guides to determining what is reasonable . . . and not inexorable commands . . . ." (Citations omitted; internal quotation marks omitted.) *Padilla* v. *Kentucky*, supra, 559 U.S. 366–67. This court similarly observed in *Phillips* v. *Warden*, 220 Conn. 112, 134, 595 A.2d 1356 (1991), that "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable, but they are only guides." (Citation omitted; internal quotation marks omitted.) This is very likely because of the difficulty of determining when a certain practice becomes a prevailing professional norm. Furthermore, even if professional norms in Connecticut suggested in 2007 that trial counsel should inform noncitizen criminal defendants that mandatory deportation may be a collateral consequence of a guilty plea, this court had stated several years before the petitioner entered his plea that such advice was *not* constitutionally required under the relevant governing

statutes.

In *State* v. *Malcolm*, 257 Conn. 653, 662–63, 778 A.2d 134 (2001), in which this court considered whether strict compliance with § 54-1j was necessary to validate the defendant's guilty plea, the court stated that, because "only substantial compliance is required when warning the defendant of the direct consequences of a guilty plea pursuant to Practice Book § 39-19[15] in order to ensure that the plea is voluntary . . . [w]e will not require stricter compliance with regard to the collateral consequences of a guilty plea." (Citations omitted; footnotes altered; internal quotation marks omitted.) The court then added in a footnote: "*Although we do not mean to minimize the potential impact of the immigration and naturalization consequences of a plea, they are not of constitutional magnitude: 'The statutory mandate . . . cannot transform this collateral consequence into a direct consequence of the plea. It* can only recognize that this collateral consequence is of such importance that the defendant should be informed of its possibility.' *State* v. *Baeza*, 174 Wis. 2d 118, 125, 496 N.W.2d 233 (App. 1993); *United States* v. *Santelises*, 476 F.2d 787, 790 (2d Cir. 1973) ('[d]eportation . . . serious sanction though it may be, is not such an absolute consequence of conviction that we are mandated to read into traditional notions of due process a requirement that a district judge must warn each defendant of the possibility of deportation before accepting his plea'); see also *State* v. *Andrews*, 253 Conn. 497, 504, 507–508 n.8, 752 A.2d 49 (2000)." (Emphasis added.) *State* v. *Malcolm*, supra, 663 n.12. In *Andrews*, which preceded *Malcolm*, this court also emphasized that trial counsel is constitutionally required to inform a defendant only of the *direct* consequences of a guilty plea, and that Connecticut courts had not "expand[ed] the universe of direct consequences of a guilty plea beyond those enumerated in Practice Book § 39-19." *State* v. *Andrews*, supra, 507; see footnote 13 of this opinion. Prior to the petitioner's plea, the Appellate Court likewise concluded that collateral consequences such as deportation do not trigger constitutional protections. See *State* v. *Irala*, 68 Conn. App. 499, 520, 792 A.2d 109 (concluding that "[t]he impact of a plea's immigration consequences on a defendant, while potentially great, is not of constitutional magnitude and 'cannot transform this collateral consequence into a direct consequence of the plea,' " quoting *State* v. *Malcolm*, supra, 663 n.12), cert. denied, 260 Conn. 923, 797 A.2d 519, cert. denied, 537 U.S. 887, 123 S. Ct. 132, 154 L. Ed. 2d 148 (2002). More recently, the court in *Chaidez* included Connecticut in a list of approximately thirty jurisdictions that have determined that advice concerning deportation does not fall within the scope of the sixth amendment's right to effective assistance of counsel; *Chaidez* v. *United States*, supra, 133 S. Ct. 1109 n.8; and observed that the decision in *Padilla* had "altered

the law of most jurisdictions . . . ." Id., 1110. Accordingly, even if professional norms at the time the petitioner entered his guilty plea required that trial counsel inform a noncitizen criminal defendant of a plea's virtually mandatory deportation consequences, the rule announced in *Padilla* was a new rule under Connecticut law because more than one Connecticut court had noted several years before the petitioner's plea that such advice was not constitutionally required.[16] We are therefore compelled to conclude that the petitioner's ineffective assistance of counsel claim does not allege a constitutional violation.[17]

The petitioner counters that, under *Padilla* and *Chaidez*, the sixth amendment right to counsel makes no categorical distinction between collateral and direct consequences. He also contends that this court should adopt a narrower definition of what constitutes a new rule than that allowed under the federal standard, as the Massachusetts Supreme Judicial Court did in *Commonwealth* v. *Sylvain*, 466 Mass. 422, 435, 995 N.E.2d 760 (2013). We are not persuaded.

With respect to the distinction between collateral and direct consequences, we agree with the petitioner that *Padilla* rejected that distinction, but the petitioner overlooks the fact that the court's decision in *Padilla* to reject the distinction was the reason why the court in *Chaidez* concluded that the rule announced in *Padilla* was new. *Chaidez* v. *United States*, supra, 133 S. Ct. 1110–11. Indeed, the court in *Chaidez* stressed this point when it stated: "If [breaching the chink-free wall between direct and collateral consequences] does not count as 'break[ing] new ground' or 'impos[ing] a new obligation,' we are hard pressed to know what would." Id. Thus, *Chaidez* affirms that courts in the majority of jurisdictions that have considered the sixth amendment right to counsel have traditionally distinguished between collateral and direct consequences and, as we have previously noted, continue to do so today.

We also reject the petitioner's suggestion that this court should follow the reasoning of the Massachusetts Supreme Judicial Court in *Sylvain*. In that case, the court affirmed the continuing applicability of *Commonwealth* v. *Clarke*, 460 Mass. 30, 949 N.E.2d 892 (2011), in which the court had determined two years before the Supreme Court's decision in *Chaidez* that the rule announced in *Padilla* applied retroactively under the framework established in *Teague* because the rule was not new in Massachusetts. *Commonwealth* v. *Sylvain*, supra, 466 Mass. 423–24. The court explained as follows: "In *Clarke*, we concluded that '[t]here is no question that the holding in *Padilla* is an extension of the rule in *Strickland*,' [*Commonwealth* v. *Clarke*, supra, 37], and that *Padilla* is the 'definitive application of an established constitutional standard on a case-by-case basis, incorporating evolving professional norms (on which

the standard relies) to new facts.' [Id.] 43. This determination reflected our recognition that the standard for measuring ineffective assistance of counsel under *Strickland* is one of general applicability, designed to evaluate the reasonableness of an attorney's acts or omissions in a multitude of factual contexts. [Id.] 36, 38–39, 43. . . . Because application of such a general standard to a particular factual scenario rarely produces a new rule, [id.] 36 . . . we concluded that *Padilla* did not announce a new rule and, thus, that the [s]ixth [a]mendment right enunciated in *Padilla* applied retroactively to cases on collateral review under the *Teague* framework. [Id.] 45." (Citations omitted; emphasis omitted; footnotes omitted.) *Commonwealth* v. *Sylvain*, supra, 429.

To resolve the conflicting outcomes in *Clarke* and *Chaidez*, the court in *Sylvain* distinguished between what it called the "original" definition of a new rule in *Teague* and the "post-*Teague* expansion" of the definition by the United States Supreme Court. Id., 433. The court in *Sylvain* first noted that, "according to the original formulation discussed in [*Teague* v. *Lane*, supra, 489 U.S. 301], 'a case announce[d] a new rule if the result was not dictated by precedent' at the time the defendant's conviction became final. In its subsequent jurisprudence, however, the Supreme Court has greatly expanded the meaning of what is 'new' to include results not 'apparent to all reasonable jurists' at the time. *Lambrix* v. *Singletary*, 520 U.S. 518, 527–28 [117 S. Ct. 1517, 137 L. Ed. 2d 771] (1997)." *Commonwealth* v. *Sylvain*, supra, 466 Mass. 433. The court then determined that, although it had incorporated the "original" formulation into the Massachusetts definition of a new rule when it adopted the *Teague* framework in *Commonwealth* v. *Bray*, 407 Mass. 296, 300–301, 553 N.E.2d 538 (1990), it would not incorporate the expanded definition into Massachusetts law but, rather, would continue to adhere to the "original" definition that a rule is new only when the result is not dictated by precedent. *Commonwealth* v. *Sylvain*, supra, 433–34. Thus, relying on *Clarke* and the so-called "original" definition of a new rule in *Teague*, the court in *Sylvain* concluded: "*Padilla* did not announce a 'new' rule for the simple reason that it applied a general standard—designed to change according to the evolution of existing professional norms—to a specific factual situation. . . . We also are not persuaded that Massachusetts precedent at the time *Padilla* was decided would have dictated an outcome contrary to that in *Padilla*. Indeed, long before *Padilla* was decided, it was customary for practitioners in Massachusetts to warn their clients of the possible deportation consequences of pleading guilty." (Citations omitted.) Id., 435.

We disagree with this logic because it conflates the reasonableness standard applied under the performance prong of *Strickland* with the rule articulated in

*Padilla*, regardless of whether the "original" or "expanded" definition of a new rule is used. More specifically, in concluding that the holding in *Padilla* was not a new rule but an extension of the reasonableness prong in *Strickland*, the court in *Sylvain* failed to acknowledge that *Padilla* addressed a question that had never been settled. As the court subsequently explained in *Chaidez*, "*Padilla* did something more [than consider an attorney's possible professional incompetence]. Before deciding if failing to provide such advice fell below an objective standard of reasonableness, *Padilla* considered a threshold question: Was advice about deportation categorically removed from the scope of the [s]ixth [a]mendment right to counsel because it involved only a collateral consequence of a conviction, rather than a component of the criminal sentence? . . . In other words, prior to asking *how* the *Strickland* test applied (Did this attorney act unreasonably?), *Padilla* asked *whether* the *Strickland* test applied (Should we even evaluate if this attorney acted unreasonably?). And as we will describe, that preliminary question about *Strickland*'s ambit came to the *Padilla* [c]ourt unsettled—so that the [c]ourt's answer (Yes, *Strickland* governs here) required a new rule." (Citation omitted; emphasis in original; footnote omitted; internal quotation marks omitted.) *Chaidez* v. *United States*, supra, 133 S. Ct. 1108. Thus, by describing the holding in *Padilla* as an extension of *Strickland*, which was not a new rule, the court in *Sylvain* ignored the fact that the question of whether attorneys are *constitutionally required* to advise noncitizen criminal defendants of the deportation consequences of a guilty plea had never been addressed before *Padilla*. See id. (court in *Hill* explicitly left open question of whether attorney advice regarding collateral consequences must satisfy sixth amendment requirements). The court in *Sylvain* also ignored the fact that the ruling in *Padilla* was grounded in a legal analysis of the direct and indirect consequences of a plea, and that the court in *Padilla* had examined prevailing professional norms under the performance prong of *Strickland* only *after* resolving the threshold constitutional question of whether the rule applied in that case. We thus dismiss the reasoning in *Sylvain* because it fails to recognize that the rule announced in *Padilla* was new,[18] and not merely an extension of the rule articulated in *Strickland*.[19]

## D

The petitioner further argues that this court should apply *Padilla* retroactively because Connecticut habeas petitions function as de facto direct review for ineffective assistance of counsel claims, and both old and new rules are always applicable on direct review. We disagree that state habeas proceedings provide the first and only opportunity to adjudicate ineffectiveness claims on their merits and thus function as direct review proceedings. As we have previously discussed herein,

the first opportunity to raise an ineffectiveness claim relating to a guilty plea is in the trial court through a motion to withdraw the plea. See Practice Book § 39-27 (4). Furthermore, even if most ineffectiveness claims are filed in habeas court, concerns regarding the finality of judgments and the costs imposed on states by the retroactive application of new rules in habeas proceedings, where there are virtually no time limitations that restrict a petitioner's ability to bring a claim, generally outweigh the benefits. We are therefore not persuaded by this argument.

E

In the alternative, the petitioner argues that, even if this court determines that *Padilla* cannot be applied retroactively under federal or state law, his counsel grossly misadvised him, thus rendering his plea unintelligent, involuntary, and invalid. We decline to review this due process claim[20] because it was not raised in the petitioner's habeas petition, pretrial memorandum, posttrial brief, or preliminary counterstatement of issues.

The applicable legal principles are well established. "In a writ of habeas corpus alleging illegal confinement the application must set forth specific grounds for the issuance of the writ including the basis for the claim of illegal confinement. . . . [T]he petition for a writ of habeas corpus is essentially a pleading and, as such, it should conform generally to a complaint in a civil action. . . . It is fundamental in our law that the right of a plaintiff to recover is limited to the allegations of his complaint." (Citation omitted; internal quotation marks omitted.) *Kaddah* v. *Commissioner of Correction*, 299 Conn. 129, 137, 7 A.3d 911 (2010); see also Practice Book § 23-22 (1) ("[a] petition for a writ of habeas corpus . . . shall state . . . the specific facts upon which each specific claim of illegal confinement is based and the relief requested"). A reviewing court is "not compelled to consider issues neither alleged in the habeas petition nor considered at the habeas proceeding . . . ." (Internal quotation marks omitted.) *Gaines* v. *Commissioner of Correction*, 306 Conn. 664, 672 n.8, 51 A.3d 948 (2012). Appellate review of newly articulated claims not raised before the habeas court would amount to "an ambuscade of the [habeas] judge . . . ." (Citation omitted; internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, supra, 285 Conn. 580.

In the present case, the petitioner claimed in his petition and throughout the habeas proceeding that he was deprived of his sixth amendment right to effective assistance of counsel because of his counsel's failure to advise him of the virtually automatic deportation consequences of his plea, not because of a violation of his fifth amendment due process rights. In fact, the petitioner distinguished his sixth amendment claim of ineffective

assistance of counsel from a fifth amendment " 'knowing and voluntary' " claim raising due process concerns in his pretrial memorandum and posttrial brief. Relying on *State* v. *Irala*, supra, 68 Conn. App. 520, the petitioner observed in a footnote to his posttrial brief that, "[i]n the [f]ifth [a]mendment context, courts have not required that a trial court advise a defendant as to the precise immigration consequences of a plea in order to find that the plea is 'knowing and voluntary' because they have viewed immigration consequences as 'collateral' to the proceedings and the [f]ifth [a]mendment requires only that a defendant be aware of all the direct consequences of a plea." (Emphasis omitted.) Consequently, the habeas court did not consider or decide whether the petitioner's plea was unintelligent, involuntary, and invalid. To the extent the habeas court discussed in its memorandum of decision whether counsel provided the petitioner with " 'correct' " advice, it did so in the context of the performance prong of *Strickland* and did not consider whether counsel gave the petitioner gross misadvice that would have rendered his plea unintelligent, involuntary, and invalid.

This court previously has stated that, "[o]nly in [the] most exceptional circumstances can and will this court consider a claim, constitutional or otherwise, that has not been raised and decided in the trial court. . . . This rule applies equally to alternate grounds for affirmance. . . . *New Haven* v. *Bonner*, 272 Conn. 489, 498, 863 A.2d 680 (2005); see also *Thomas* v. *West Haven*, 249 Conn. 385, 390 n.11, 734 A.2d 535 (1999) ([t]he appellee's right to file a [Practice Book] § 63-4 [a] [1] statement has not eliminated the duty to have raised the issue in the trial court . . .), cert. denied, 528 U.S. 1187, 120 S. Ct. 1239, 146 L. Ed. 2d 99 (2000); *Peck* v. *Jacquemin*, 196 Conn. 53, 62 n.13, 491 A.2d 1043 (1985) (compliance with [Practice Book § 63-4 (a) (1)] is not to be considered in a vacuum; particularly to be considered is its linkage with [Practice Book § 60-5] which provides in part that this court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial). Such exceptional circumstances may occur where a new and unforeseen constitutional right has arisen between the time of trial and appeal or where the record supports a claim that a litigant has been deprived of a fundamental constitutional right and a fair trial. . . . An exception may also be made where consideration of the question is in the interest of public welfare or of justice between the parties. . . . *Lopiano* v. *Lopiano*, 247 Conn. 356, 373, 752 A.2d 1000 (1998)." (Footnotes omitted; internal quotation marks omitted.) *Perez-Dickson* v. *Bridgeport*, 304 Conn. 483, 498–500, 43 A.3d 69 (2012).

We conclude, as we did in *Perez-Dickson*; id., 501; that there are no such exceptional circumstances in the present case. First, no new and unforeseen right arose under the federal constitution between the time of the

petitioner's habeas trial and his appeal to this court because the habeas trial was conducted in the spring of 2012, two years *after* the ruling in *Padilla* was announced. In addition, no new state constitutional right arose during that period. Furthermore, consideration of the petitioner's state law claim does not appear to be in the interest of the public welfare or justice between the parties because it pertains primarily to the limited number of noncitizen criminal defendants who filed habeas petitions between the years 2010 and 2013, when *Padilla* and *Chaidez*, respectively, were decided. Finally, the petitioner has failed to seek appellate review of this issue pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989). We therefore decline to review this claim.

F

We similarly decline to review the petitioner's claim that his counsel's performance was deficient because he failed to pursue a substance abuse defense during plea negotiations. Any such potential claim was waived in the habeas court when the petitioner's attorney stated that the petitioner was not pursuing the drug dependency issue as an independent claim regarding his trial counsel's deficient performance and noted that it was "not an allegation in the petition."

The judgment is reversed and the case is remanded to the habeas court with direction to render judgment denying the amended petition for a writ of habeas corpus.

In this opinion ROGERS, C. J., and ESPINOSA and ROBINSON, Js., concurred.

[1] In *Padilla* v. *Kentucky*, supra, 559 U.S. 360, the United States Supreme Court concluded that defense counsel is constitutionally required to advise a client who is not a United States citizen and who is charged with an aggravated felony under federal law that deportation is virtually automatic.

The governing federal law on deportation is set forth in 8 U.S.C. § 1227 (a), which provides in relevant part: "Any alien . . . in and admitted to the United States shall, upon the order of the Attorney General, be removed if the alien is within one or more of the following classes of deportable aliens . . .

"(2) . . . (A) . . . (iii) Any alien who is convicted of an aggravated felony at any time after admission . . . ."

[2] Although the petitioner did not present this argument as an alternative ground for affirmance, we treat it as an alternative ground because resolution of the issue does not require application of the rule in *Padilla* but, rather, the rule in *Strickland*.

[3] The petition stated that the petitioner sought relief under the "sixth and fourteenth amendments to the United States constitution; article [first], [§§] 8 and 10, of the Connecticut constitution, [General Statutes §] 52-466 et seq. and [Practice Book §] 23-21 et seq."

[4] The respondent appealed from the judgment of the habeas court to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[5] The court in *Padilla* did not consider whether the defendant was prejudiced as a result of his counsel's conduct under the second prong of *Strickland*, but, rather, left that matter for the Kentucky courts to decide. *Padilla* v. *Kentucky*, supra, 559 U.S. 369.

[6] The court noted that all ten federal appellate courts and the appellate courts in almost thirty states had reached this conclusion. *Chaidez* v. *United States*, supra, 133 S. Ct. 1108.

[7] The respondent argues that the petitioner claimed in the habeas court

that *Padilla* satisfies the *Teague* test for retroactivity, and, therefore, this court should not review his claim that it is not bound by *Teague*. The issue of whether a *Teague* analysis is appropriate, however, was fully addressed by the parties in their briefs to this court. The petitioner also relied on the *Teague* test in his arguments before the habeas court, and the habeas court applied *Teague* in its discussion of the retroactivity issue. Accordingly, the applicability of *Teague* was an integral part of the habeas proceedings, and the fact that the petitioner now takes a different position as to how *Teague* applies does not negate our ability to review his claim. Cf. *Crawford* v. *Commissioner of Correction*, 294 Conn. 165, 204, 982 A.2d 620 (2009) (to entertain claim not raised in trial court would amount to trial by ambuscade, practice in which this court will not engage).

[8] The court in *Teague* identified "two exceptions to [this] general rule of nonretroactivity for cases on collateral review. First, a new rule should be applied retroactively if it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to proscribe. . . . Second, a new rule should be applied retroactively if it requires the observance of 'those procedures that . . . are implicit in the concept of ordered liberty." (Citation omitted; internal quotation marks omitted.) *Teague* v. *Lane*, supra, 489 U.S. 307. The court further explained that the second exception should be reserved for "watershed rules of criminal procedure" that "implicate the fundamental fairness of the trial" and "without which the likelihood of an accurate conviction is seriously diminished." Id., 311–13. Neither party claims that either exception applies in the present case.

[9] Thus, contrary to Justice Eveleigh's view, we "fully recognize" the holding in *Danforth* that states are not bound by *Teague* and that this court in *Luurtsema* acknowledged that holding.

[10] The fact that this court applied *Teague* in *Duperry* and *Johnson* long before the release of *Danforth* does not mean that it was compelled to do so, thus diminishing the precedential value or relevance of those cases, as Justice Eveleigh claims in his dissent. There is absolutely no evidence that this or any other state court assumed prior to *Danforth* that it was required to apply *Teague* when considering the retroactive application of *Padilla* or any other new constitutional rule of criminal procedure. Rather, state courts have always exercised their independent judgments regarding the application of *Teague* in a nonfederal context. Some jurisdictions rejected *Teague* many years before the release of *Danforth*; see, e.g., *State* v. *Towery*, 204 Ariz. 386, 393, 64 P.3d 828 (2003); *Cowell* v. *Leapley*, 458 N.W.2d 514, 518 (S.D. 1990); *Labrum* v. *State Board of Pardons*, 870 P.2d 902, 912–13 (Utah 1993); *Farbotnik* v. *State*, 850 P.2d 594, 601–602 (Wyo. 1993); one jurisdiction adopted a modified version of *Teague* before the publication of *Danforth*; see *Colwell* v. *State*, 118 Nev. 807, 819, 59 P.3d 463 (2002); and still other jurisdictions adopted *Teague* following the publication of *Danforth*, despite the reference in *Danforth* to the fact that state courts need not be bound by *Teague*. See, e.g., *In re Gomez*, 45 Cal. 4th 650, 656, 199 P.3d 574, 88 Cal. Rptr. 3d 177 (2009); *Gathers* v. *United States*, 977 A.2d 969, 972 (D.C. 2009); *Alford* v. *State*, 287 Ga. 105, 107, 695 S.E.2d 1 (2010); *Perez* v. *State*, 816 N.W.2d 354, 358 (Iowa 2012); *State* v. *Tate*, 130 So. 3d 829, 834–35 (La. 2013); *Kersey* v. *Hatch*, 148 N.M. 381, 386, 237 P.3d 683 (2010); *State* v. *Bishop*, Ohio St. 3d , 7 N.E.3d 605, 610 (2014); *Bush* v. *State*, 428 S.W.3d 1, 20 (Tenn. 2014); *Ex parte De Los Reyes*, 392 S.W.3d 675, 679 (Tex. Crim. App. 2013); *In re Gentry*, 179 Wn. 2d 614, 627–28, 316 P.3d 1020 (2014). Accordingly, it is incorrect to suggest that before the release of *Danforth* state courts believed that they were compelled to apply *Teague* and that they rushed to reject *Teague* following the release of *Danforth*. The more accurate conclusion is that state courts that applied *Teague* before *Danforth* did so because *Teague* provided them with valuable guidance that produced consistent results. *Duperry* and *Johnson* thus remain good precedent in this state that we may consider when determining whether *Teague* should be abandoned as a rule of general applicability.

[11] See *In re Gomez*, 45 Cal. 4th 650, 654–55, 199 P.3d 574, 88 Cal. Rptr. 3d 177 (2009); *Edwards* v. *People*, 129 P.3d 977, 983 (Colo. 2006); *Flamer* v. *State*, 585 A.2d 736, 749 (Del. 1990); *Gathers* v. *United States*, 977 A.2d 969, 972 (D.C. 2009); *Alford* v. *State*, 287 Ga. 105, 106–107, 695 S.E.2d 1 (2010); *State* v. *Jess*, 117 Haw. 381, 424, 184 P.3d 133 (2008); *People* v. *Flowers*, 138 Ill. 2d 218, 239–40, 561 N.E.2d 674 (1990); *Daniels* v. *State*, 561 N.E.2d 487, 489 (Ind. 1990); *Perez* v. *State*, 816 N.W.2d 354, 358 (Iowa 2012); *State* v. *Neer*, 247 Kan. 137, 142–43, 795 P.2d 362 (1990); *Bowling* v. *Commonwealth*, 163 S.W.3d 361, 370 (Ky. 2005); *State* v. *Tate*, 130 So. 3d 829, 834 (La. 2013); *Carmichael* v. *State*, 927 A.2d 1172, 1176–81 (Me. 2007);

*State* v. *Houston*, 702 N.W.2d 268, 270 (Minn. 2005); *Manning* v. *State*, 929 So. 2d 885, 897 (Miss. 2006); *State* v. *Egelhoff*, 272 Mont. 114, 125–26, 900 P.2d 260 (1995); *State* v. *Reeves*, 234 Neb. 711, 750, 453 N.W.2d 359 (1990); *State* v. *Tallard*, 149 N.H. 183, 186–87, 816 A.2d 977 (2003); *State* v. *Purnell*, 161 N.J. 44, 64, 735 A.2d 513 (1999); *Kersey* v. *Hatch*, 148 N.M. 381, 383, 237 P.3d 683 (2010); *People* v. *Baret*, Court of Appeals, Docket No. 105, 2014 N.Y. Slip Op. 04872, 2014 WL 2921420, *12 (N.Y. June 30, 2014); *State* v. *Zuniga*, 336 N.C. 508, 513, 444 S.E.2d 443 (1994); *State* v. *Bishop*,     Ohio St. 3d    , 7 N.E.3d 605, 610 (Ohio 2014); *Burleson* v. *Saffle*, 46 P.3d 150, 151 (Okla. Crim. App. 2002); *Page* v. *Palmateer*, 336 Or. 379, 387–88, 84 P.3d 133 (2004); *Commonwealth* v. *Hughes*, 581 Pa. 274, 306–307, 865 A.2d 761 (2004); *Pierce* v. *Wall*, 941 A.2d 189, 195 (R.I. 2008); *Talley* v. *State*, 371 S.C. 535, 541, 640 S.E.2d 878 (2007); *Bush* v. *State*, 428 S.W.3d 1, 20 (Tenn. 2014); *Ex parte De Los Reyes*, 392 S.W.3d 675, 679 (Tex. Crim. App. 2013); *State* v. *White*, 182 Vt. 510, 517–18, 944 A.2d 203 (2007); *Mueller* v. *Murray*, 252 Va. 356, 361–66, 478 S.E.2d 542 (1996); *In re Gentry*, 179 Wn. 2d 614, 627–28, 316 P.3d 1020 (2014); *State* v. *Lo*, 264 Wis. 2d 1, 33–34, 665 N.W.2d 756 (2003).

[12] To the extent that Justice Eveleigh in his dissent dismisses these cases because of perceived deficiencies in their substantive analysis, he misses the point that they are cited only to show that, contrary to the petitioner's assertion, the retroactive application of *Padilla* could result in the filing of a large number of claims because the pool of potential applicants is not necessarily extremely limited. We also disagree with Justice Eveleigh's assumption in footnote 1 of his dissenting opinion that "the majority of the individuals with convictions similar to the petitioner's would likely already have been deported . . . ." There is no evidence in the record as to how many convicted offenders who are now serving prison sentences in Connecticut will be subject to deportation upon their release. Accordingly, there is no support for Justice Eveleigh's assumption.

[13] Contrary to the respondent's suggestion, this claim was raised sufficiently in the amended petition for a writ of habeas corpus when the petitioner alleged that his trial counsel's representation "fell below the standard of reasonably competent counsel in the practice of criminal law in the state of Connecticut at the time of [the] petitioner's plea and conviction."

[14] General Statutes § 54-1j (a) provides: "The court shall not accept a plea of guilty or nolo contendere from any defendant in any criminal proceeding unless the court first addresses the defendant personally and determines that the defendant fully understands that if the defendant is not a citizen of the United States, conviction of the offense for which the defendant has been charged may have the consequences of deportation or removal from the United States, exclusion from readmission to the United States or denial of naturalization, pursuant to the laws of the United States. If the defendant has not discussed these possible consequences with the defendant's attorney, the court shall permit the defendant to do so prior to accepting the defendant's plea."

[15] Practice Book § 39-19 provides: "The judicial authority shall not accept the plea without first addressing the defendant personally and determining that he or she fully understands:

"(1) The nature of the charge to which the plea is offered;

"(2) The mandatory minimum sentence, if any;

"(3) The fact that the statute for the particular offense does not permit the sentence to be suspended;

"(4) The maximum possible sentence on the charge, including, if there are several charges, the maximum sentence possible from consecutive sentences and including, when applicable, the fact that a different or additional punishment may be authorized by reason of a previous conviction; and

"(5) The fact that he or she has the right to plead not guilty or to persist in that plea if it has already been made, and the fact that he or she has the right to be tried by a jury or a judge and that at that trial the defendant has the right to the assistance of counsel, the right to confront and cross-examine witnesses against him or her, and the right not to be compelled to incriminate himself or herself."

[16] Justice Palmer contends in his dissent that the Connecticut case law on which we rely was not binding precedent at the time of the petitioner's plea because it did not address what is constitutionally required of trial counsel under the sixth amendment, but, rather, addressed only "what is required of the trial court when canvassing a defendant to ensure that a plea is voluntary under the *fifth* amendment." (Emphasis in original.) We disagree. In each of the cited cases, the reviewing court determined that trial courts are not constitutionally required under § 54-1j to advise defendants of the deportation consequences of a guilty plea because deportation is not a

direct consequence of a plea under Practice Book § 39-19. See *State* v. *Malcolm*, supra, 257 Conn. 663 n.12 (immigration and naturalization consequences of guilty plea not of constitutional magnitude because statutory mandate of § 54-1j cannot transform collateral consequences of deportation into direct consequences of plea under Practice Book § 39-19); *State* v. *Andrews*, supra, 253 Conn. 507 and n.8 (trial courts not constitutionally required to advise defendants of immigration consequences of guilty plea under § 54-1j because they are not direct consequences of plea under Practice Book § 39-19); *State* v. *Irala*, supra, 68 Conn. App. 520 (same). This is significant because the petitioner specifically argues, citing *State* v. *Hall*, 303 Conn. 527, 35 A.3d 237 (2012), that *Padilla* was not a new rule in Connecticut because the existence and application of § 54-1j provided evidence that the established professional norm in this state at the time he entered his plea was for counsel to give defendants accurate advice regarding the deportation consequences of a plea. The court in *Hall* explained, however, that when § 54-1j was amended in 2003 to require counsel to discuss with defendants the immigration consequences of a plea, "the legislature was primarily concerned with ensuring that defendants engage in a conversation with their counsel, not the court, regarding the immigration consequences of guilty pleas." (Emphasis omitted.) Id., 536. Thus, as the court in *Hall* observed, the purpose of the statute of warning defendants about the possible immigration consequences of a guilty plea remained the same; id., 535; and the fact that the 2003 amendment required counsel, instead of the court, to advise defendants of these consequences did not change the underlying and more general conclusion in *Malcolm*, *Andrews* and *Irala* that advising defendants of the immigration and deportation consequences of a plea was not *constitutionally* required under § 54-1j.

[17] This conclusion also disposes of the petitioner's argument that this court should apply *Padilla* retroactively because Connecticut historically has given special solicitude to the right to counsel and should continue to uphold that tradition in the present case.

[18] Although the court in *Teague* did not find it necessary to define the meaning of a rule, it is clear that the court was referring to a constitutional rule of criminal procedure issued by a court that would be used as a guiding principle in future cases. Thus, the court repeatedly referred to the fact that new rules are "announced' or "promulgated" only in specific cases; *Teague* v. *Lane*, supra, 489 U.S. 300–304; and that a case does not announce a new rule if the result is dictated by "precedent"; id., 301; or by the application of a principle that governed a past decision. Id., 307; see also *Chaidez* v. *United States*, supra, 133 S. Ct. 1107.

[19] We also disagree with Justice Eveleigh's determination in his dissenting opinion that Connecticut should adopt a "modified" version of the *Teague* test similar to the tests adopted in Nevada and Idaho. In *Colwell* v. *State*, 118 Nev. 807, 819, 59 P.3d 463 (2002), the Nevada Supreme Court adopted the general framework of *Teague* but reserved its prerogative "to define and determine within this framework whether a rule is new and whether it falls within the two exceptions to nonretroactivity . . . ." The court defined the criteria for determining whether a rule is new as whether the rule "[1] overrules precedent, or [2] disapprove[s] a practice [the] [c]ourt had arguably sanctioned in prior cases, or [3] overturns a longstanding practice that lower courts had uniformly approved." (Footnote omitted; internal quotation marks omitted.) Id., 819–20. It then adopted a broadened version of the two exceptions in *Teague* to the general requirement that new rules are not retroactive, stating that a new rule may be applied retroactively: "(1) if the rule establishes that it is unconstitutional to proscribe certain conduct as criminal or to impose a type of punishment on certain defendants because of their status or offense; or (2) if it establishes a procedure without which the likelihood of an accurate conviction is seriously diminished." Id., 820. The court noted that, unlike in *Teague*, it did "not limit the first exception to 'primary, private individual' conduct, allowing the possibility that other conduct may be constitutionally protected from criminalization and warrant retroactive relief. And with the second exception, [it did] not distinguish a separate requirement of 'bedrock' or 'watershed' significance: if accuracy is seriously diminished without the rule, the rule is significant enough to warrant retroactive application." Id. The Idaho Supreme Court also adopted a modified version of the *Teague* framework, concluding that, "in the future, the decisions of the courts of this state whether to give retroactive effect to a rule of law should reflect independent judgment, based upon the concerns of this [c]ourt and the 'uniqueness of our state, our [c]onstitution, and our long-standing jurisprudence.' " *Rhoades* v. *State*, 149 Idaho 130, 139, 233 P.3d 61 (2010), cert. denied,      U.S.     , 131 S. Ct. 1571, 179 L. Ed. 2d 477 (2011). The Idaho Supreme Court, however, specifically rejected the Nevada Supreme Court's broadening of the two exceptions to the nonretroactivity of a new rule under *Teague*. Id., 139 n.2.

Justice Eveleigh is persuaded by this reasoning and suggests that Connecticut also should adopt a modified version of the *Teague* test and, in deciding whether to give retroactive effect to a new constitutional rule, "should exercise independent judgment on the basis of the unique requirements of our state constitution, judicial precedents and statutory framework." He further suggests that, "if the [accuracy and] fundamental fairness of a trial or plea is seriously diminished without the rule, the rule is significant enough to warrant retroactive application." We disagree.

We first note that Justice Eveleigh's proposed "modification" of *Teague* does not appear to involve any change in the rule itself, but, rather, would allow a more liberal application of its second exception, which is reserved under *Teague* v. *Lane*, supra, 489 U.S. 288, for "watershed rules of criminal procedure"; id., 311; that "implicate the fundamental fairness of the trial"; id., 312; and "without which the likelihood of an accurate conviction is seriously diminished." Id., 313; see footnote 8 of this opinion. In other words, instead of disavowing *Teague*, Justice Eveleigh states that this court should adopt the principles of *Teague* but "exercise independent judgment on the basis of the unique requirements of our state constitution, judicial precedents and statutory framework" in implementing the fundamental fairness and accuracy elements of the second exception of *Teague*. Regardless of how Justice Eveleigh's approach is characterized, it virtually swallows the exception because it allows the court to decide whether a constitutional rule is new on the basis of whatever the court finds persuasive, including Connecticut's statutory framework and whether the trial or plea is deemed to be "fair" without application of the rule. In the present case, this results in elevating § 54-1j, which provides that the court must ask whether a defendant fully understands the deportation consequences of a proposed guilty plea and whether he has discussed these possible consequences with his attorney; see footnote 14 of this opinion; to the status of a constitutional requirement, even though this court had concluded before *Padilla* that advising a defendant of the deportation consequences of a guilty plea was not constitutionally required. See our previous discussion herein. It also opens the door to claims that the directives of other statutes are constitutional requirements in contexts other than the conduct of attorneys.

Justice Eveleigh's approach resembles the more liberal approach previously followed by federal courts but abandoned in *Teague* for lack of consistent results. The United States Supreme Court's modern retroactivity jurisprudence began with a pair of cases in the 1960s that gave birth to the *Linkletter-Stovall* test. See *Stovall* v. *Denno*, 388 U.S. 293, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967); *Linkletter* v. *Walker*, 381 U.S. 618, 85 S. Ct. 1731, 14 L. Ed. 2d 601 (1965). Under that test, federal courts determined whether to apply a new constitutional rule of criminal procedure retroactively on a case-by-case basis by considering three factors: (1) the purpose of the new rule; (2) the extent to which law enforcement authorities relied on the old rule; and (3) the effect that applying the new rule retroactively would have on the administration of justice. *Stovall* v. *Denno*, supra, 297. While the *Linkletter-Stovall* test allowed courts flexibility in determining a new rule's retroactive effect, the test ultimately led to inconsistent and unpredictable results. See *Desist* v. *United States*, 394 U.S. 244, 257–58, 89 S. Ct. 1030, 22 L. Ed. 2d 248 (1969) (Harlan, J., dissenting); *State* v. *Zuniga*, 336 N.C. 508, 511–12, 444 S.E.2d 443 (1994). The approach proposed by Justice Eveleigh, although not identical to the *Linkletter-Stovall* test, is subject to a similar weakness because it permits an overly broad interpretation of "fundamental fairness." Just as the great majority of states have largely followed *Teague* in their own postconviction proceedings rather than fashioning a different rule or broadening the two exceptions, we also conclude that the *Teague* test, and its exceptions, as articulated in that case, represent an appropriate and workable solution to the problem of when to apply a new constitutional rule of criminal procedure retroactively.

Finally, insofar as Justice Eveleigh determines that this court should give retroactive effect to the rule in *Padilla* under the second *Teague* exception, we note that neither party made such a claim on appeal to this court. The respondent claimed that the judgment should be reversed because *Padilla* announced a new rule that applied prospectively in Connecticut. In reply, the petitioner argued in part that the rule in *Padilla* should be applied retroactively because it was not a new rule in Connecticut. Neither party argued that the rule was new but applied retroactively under the second *Teague* exception, nor did the trial court decide the issue on that ground. The trial court determined that the rule in *Padilla* applied retroactively because it was not a new rule under federal or state law. Accordingly, this court is not empowered to address the retroactive application of the rule in *Padilla* under the second *Teague* exception.

[20] Although the petitioner does not characterize this as a due process claim, the cases he cites in arguing that "Connecticut courts have made

clear that to be valid, a guilty plea must be intelligent, voluntary and knowing," refer to an unknowing, unintelligent, and involuntary plea as a due process violation. See *State* v. *Gilnite*, 202 Conn. 369, 381–82, 521 A.2d 547 (1987) ("A plea of guilty . . . involves the waiver of several fundamental constitutional rights and therefore must be knowingly and voluntarily entered so as not to violate due process. . . . Thus, for a plea to be valid, the record must affirmatively disclose that the defendant understands the nature of the charge upon which the plea is entered . . . ." [Citations omitted; footnotes omitted.]); *Sherbo* v. *Manson*, 21 Conn. App. 172, 178–79, 572 A.2d 378 ("A guilty plea, which is itself tantamount to conviction, may be accepted by the court only when it is made knowingly, intelligently, and voluntarily. . . . A guilty plea otherwise obtained is in violation of due process and voidable." [Citation omitted.]), cert. denied, 215 Conn. 808, 809, 576 A.2d 539, 540 (1990).